UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
                                    )
        v.                          )   CRIMINAL NO.
                                    )   05- 10176− RCL
BRANDON DELGADO                     )
                                    )
_____)

**DEFENDANT BRANDON DELGADO'S MEMORANDUM
REGARDING PRETRIAL DETENTION**

The defendant Brandon Delgado ("Delgado") is presently under an order of detention that was entered without prejudice. Delgado seeks pretrial release subject to both electronic monitoring and the custodial supervision, pursuant to 18 U.S.C. § 3142(c)(B)(i), of Ms. Ann Kelley, his second cousin. Ms. Kelley resides at 3 Aucoot Rd., 2nd Floor, Mattapoisett, MA 02739 with her two children. She is presently employed as the manager of an adult residential facility in South Dartmouth Massachusetts that is operated by "Better Community Living" and funded by the Massachusetts Department of Mental Retardation. Ms. Kelley has been advised of the responsibilities of a custodial supervisor and is willing to act as the defendant's supervisor.

Delgado is charged by indictment with six counts of cocaine or cocaine base possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Each count involves less than five grams of either cocaine base or cocaine powder. The total amount of the cocaine base in all the cocaine

base counts is approximately 5 grams.  There is no applicable minimum mandatory sentence.  Delgado is 22 years old.  His record does not include any adult convictions.  There are, however, charges pending against him in the Bristol County Superior Court for the possession and discharge of a firearm.

Since Delgado is charged with drug offenses subjecting him, if convicted, to a maximum term of imprisonment of ten years or more, under 18 U.S.C. § 3142(e), there is a rebuttable presumption that no condition or combination of conditions will reasonably assure his appearance as required or the safety of the community. Under 18 U.S.C. § 3142(f), the facts a judicial officer uses to support a finding that no conditions or combinations of conditions will reasonably assure the safety of any other person and the community "shall be supported by clear and convincing evidence."

Orders of pretrial detention are made on the basis of judgments of risks that are not empirically measurable.  The calibration of the risk of a defendant's flight or the danger his release would impose upon the community is subjective and intuitional.  It is a leap from objective facts by a process that is subjective.  Only the conclusion of the process is articulated. And that articulated conclusion is little more than the manifestation of an attitude.  The process from which it is derived is virtually impossible to describe.[1]

---

[1] The oft quoted statement from the opening paragraph of Holmes' lectures on "The Common Law" − "The life of the law has not been logic:  It has been experience" − is not an answer to this observation, it is a recognition of the limits of articulated logic in dealing with issues of law.  Holmes' observation was hardly original.  Pascal equates judgment with intuition and he too distinguishes it from mathematics.   "Most frequently it is not possible to demonstrate it [a non-mathematical truth] logically, as in mathematics, because we are not aware of the principles in that way, and it would be an endless task to set about it.  The Truth must be seen straightaway, at a glance, and not through a process of reasoning, at least up to a point. . . .It is not that the mind does not

2

Delgado submits that detention orders have been overly routine and well beyond the scope of what the 1984 amendments to the Bail Reform Act, which produced the current detention provisions, were intended to encompass.[2]  The judicial attitude needs recalibration.

Prior to the 1984 amendments there was no express authority in the bail laws, except in capital cases, to detain dangerous persons who sought release pending trial.[3] One of the principal purposes of the amendments was to provide such authority.[4] The amendments, however, were clearly not intended to produce dramatic increases in pretrial detention.  Thus Senate Report 225,[5] embodying the legislative history of the amendments, refers to a need "to protect the community from <u>demonstrably dangerous defendants</u>"[6] and a need "for authority to deny release to those defendants <u>who pose an especially grave risk </u>to the safety of the community;"[7] it notes that "there is a <u>small</u> but identifiable group <u>of particularly dangerous</u> defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of

---

do it, but that it does it silently, naturally, and simply,  for no one can give it expression, and only a few can feel it."  Blaise Pascal, Pensees, Oxford World Classics, Anthony Levi, Editor, 1999 at 151-52.

[2]  Delgado's descriptions of the "legislative history" of the 1984 amendments to the Bail Reform Act that produced the pretrial detention provisions of 18 U.S.C. § 3142 are drawn from Senate Report 225, 98th Cong. 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 3182 *et seq*. (hereinafter cited as "Senate Report 225").

[3]  "[T]he Bail Reform Act of 1966 . . . adopted the concept that in noncapital cases a person is to be ordered released pretrial under those minimal conditions reasonably required to assure his presence at trial.  Danger to the community and the protection of society are not to be considered as release factors under the law."  Senate Report 225, at pages 4-5.

[4]  Id. at 5-6.

[5]  See note 34.

[6]  Senate Report 225, at page 7.

[7]  <u>Id</u>. at page 5

3

the community or other persons;"[8] and it urges that "[i]t is with respect to this <u>limited group of offenders</u> that the courts must be given the power to deny release pending trial."[9]

The legislative history manifestly reserves pretrial detention for only a "small" and "limited group" of "particularly" and "demonstrably" dangerous defendants," "who pose an especially grave risk to the safety of the community." Such limitations certainly indicate that Congress did not anticipate any major increase in the numbers of persons detained. Indeed, while acknowledging that the provision of statutory authority for pretrial detention was a substantial change in federal law, the Senate Report noted that a "substantial minority of Federal defendants in the past have in fact been detained because of an inability to meet conditions of release" and it added that "while the imposition of such conditions has apparently been for the purpose of assuring the defendant's appearance at trial, the underlying concern has been the need to detain a particularly dangerous defendant, a concern which the [then current] Bail Reform Act fails to address."[10] The obvious suggestion was that the amendments permitting detention of demonstrably dangerous defendants would simply legitimize existing practice. The stated "substantial minority" of federal defendants detained under the previous law that is referenced in the Senate Report was drawn form a pretrial services study indicating that 4,766 (approximately 15%) of 31,108 federal defendants were never released.[11]

How many more defendants than this 15% would one reasonably expect to be detained under legislation designed to encompass, legitimately,

---

[8] <u>Id</u>. at page 6-7
[9] <u>Id</u>. at page 7
[10] <u>Id</u>. at page 10.
[11] These figures are set forth in footnote 33 at page 10 of Senate Report 225.

a small and limited group of particularly and demonstrably dangerous persons who pose an especially grave risk to the safety of the community?

The "Year-In-Review Report of the United States Probation and Pretrial Services System" for fiscal year 2003, the latest such Report available, states, at page 8 − "Of the 88,735 cases closed during the year, <u>56 percent were never released</u> at any time between arrest and the conclusion of their cases. The detention rate was the highest in 12 years, as there has been a small but steady increase since fiscal year 1992 when the rate was 38 percent." (Emphasis added.)

This extraordinary increase in detention rates is even more startling in light of current technology − electronic monitoring. This condition of release was effectively unavailable in 1984. Today it is undeniably a condition of release that is extremely effective in assuring safety to the community.

This district's statistics fairly correspond to those reflected in the fiscal 2003 report for the entire Pretrial Services System. In this district's last fiscal year, there were 626 active cases, 614 Pretrial Service reports prepared and 317 detentions. The detention rate was 51%. Of perhaps more interest, however, is that out of those 626 cases, there were only 365 detention hearings. Of the 365 defendants for whom there were hearings, 317 were detained. In other words, in 87% of the instances in which the government sought detention, a judicial officer obliged.

Delgado submits that this extraordinary increase in the percentage of defendants detained pretrial indicates a detention threshold that is set too low. Perhaps desensitized by plea rates of over 95% and conviction rates by plea or trial in excess of 99%, the courts are not sufficiently vigilant in

safeguarding a statistically dubious presumption of innocence.  Delgado should not be a victim this low threshold.

>By his attorneys,
>
>s/ Michael J. Liston
>
>_____
>Michael J. Liston BBO# 301760
>2 Park Plaza, Suite 610
>Boston, MA  02118
>(617) 426-2281

Dated:  September 5, 2005

6